UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONIKA ABRAHAMYAN,<br>Petitioner,<br>v.<br>DAVID J. VENTURELLA, et al.,<br>Respondents. | Case No. 5:26-cv-04989-HDV-DFM<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION [2]** |

## I. INTRODUCTION

"In our society liberty is the norm." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

As the cornerstone upon which our nation was founded, this bedrock principle should go without saying in any serious legal dispute. Yet the uncontested facts in the present action highlight precisely why it bears repeating here. The United States Constitution recognizes that every individual within our borders has an inherent right to be free. While a noncitizen's Fifth Amendment liberty interest undoubtedly may be qualified or diminished, it can never be extinguished. Our immigration laws are organized around this principle. Indeed, the Immigration and Nationality Act ("INA") sets express limits and conditions governing when and how noncitizens may be arrested and detained.

On August 9, 2026, Petitioner Monika Abrahamyan was arrested by Immigration and Customs Enforcement ("ICE") officers without a warrant, without any exigency, and with no consideration given to her nearly ten years in the United States, her pending asylum claim, her employment authorization, and her complete lack of criminal history or threat to public safety. Her subsequent detention likely violated the Constitution, the Immigration and Nationality Act, ICE's own regulations, and common decency.

Simply put, "[a]rbitrary civil detention is not a feature of our American government." *Rodriguez v. Marin*, 909 F.3d 252, 256–57 (9th Cir. 2018). Rules matter. There is a right way to do things, and a wrong way. We expect the government to know the difference and to act accordingly.

Finding that Petitioner's due process rights have been violated, the Court released her from custody on September 10, 2026. This written order memorializes the basis for that release.

## II. BACKGROUND

Petitioner is a 28-year-old native and citizen of Armenia who was inspected and lawfully admitted to the United States, along with her family, on a visitor visa on November 9, 2016. Petition ¶ 16, Ex. 1, Passport [Dkt. 1-1]; *Id.*, Ex. 1, Form I-94 [Dkt. 1-2]. Petitioner's visa authorized her stay until May 8, 2017. Form I-94. Before the expiration of her authorized stay, Petitioner's family filed a joint affirmative Form I-589 Application for Asylum and for Withholding of Removal ("Asylum Application") with United States Citizenship and Immigration Service ("USCIS"), on

which Petitioner was included as a derivative applicant. Petition ¶ 17, Ex. 4, Asylum Application Receipt [Dkt. 1-4]. The Asylum Application Receipt from US Department of Homeland Security ("DHS") US Citizenship & Immigration Services ("USCIS") states "Your complete Form I-589 asylum application was received and is pending as of 5/16/17. You may remain in the U.S. until your asylum application is decided." *Id.* The Asylum Application is pending, and USCIS has not yet scheduled an interview. Petition ¶ 17. The required annual asylum application fee has been paid. *Id.* USCIS granted Petitioner employment authorization. *Id.*, Ex. 3, Employment Authorization Card [Dkt.1-3].

Petitioner has lived continuously in the United States since her arrival as a minor nearly ten years ago. Petition ¶ 27. She lives with her parents and four siblings at a permanent address in Burbank, California. *Id.* Petitioner has worked as a quality-assurance engineer for Snapchat and Apple and owns and operates her own California business. *Id.* ¶ 17. She is a certified yoga instructor. *Id.* ¶ 23. Petitioner has no criminal history. *Id.* ¶ 28. She serves as a respite caregiver for her U.S. citizen, younger brother, Daniel, who has autism spectrum disorder "requiring very substantial support" and a moderate intellectual disability. *Id.* ¶ 21. Petitioner plays an integral role in Daniel's nighttime routine, helping him relax and fall asleep with nightly breathing exercises and yoga. *Id.* ¶ 23.

On August 9, 2026, ICE agents took Petitioner into custody at Los Angeles International Airport upon her return from a domestic trip. *Id.* ¶ 18. The agents served Petitioner with a Notice to Appear, placing her in removal proceedings under Section 240 of the INA. *Id.* ¶ 20, Ex. 5, Notice to Appear [Dkt. 1-5]. The ICE agents pressed her to sign a document agreeing to depart voluntarily, which she refused to do. *Id.* ¶ 20. The agents did not have a warrant for Petitioner's arrest, and she was not told the reason for her arrest. *Id.* Petitioner explained that she had entered the country on a visa and had a timely, still-pending asylum application. *Id.* The ICE agents responded that because the asylum application was not yet approved, she was not eligible to remain. *Id.*

This is the first time Petitioner has ever been in ICE custody. *Id.* Respondents have never required her to attend ICE check-ins and Petitioner has never failed to appear for any immigration obligation. *Id.* ¶ 28. She was held at the Adelanto ICE Processing Center from the date of her arrest,

August 9, 2026, until the Court ordered her release. *Id.* During her detention, Petitioner's chronic health problems flared up, causing her significant pain and discomfort, for which she received no treatment. *Id.* ¶ 26.

Through counsel, Petitioner filed a Petition for Writ of Habeas Corpus ("Petition") and an Ex Parte Application for Temporary Restraining Order ("Application") on August 28, 2026. [Dkts. 1, 2]. In her Application, Petitioner requested immediate release from immigration detention. Application at 2; Petition at 17. The Petition asserted three claims for relief: (1) Violation of the Fifth Amendment Right to Substantive Due Process, (2) Violation of the Fifth Amendment Right to Procedural Due Process, and (3) Warrantless Arrest in Violation of 8 U.S.C. § 1357. *See* Petition. On August 31, 2026, the Court issued a Stay Put Order and Briefing Schedule on the Application, which the Court construed as a Motion for Preliminary Injunction. [Dkt. 8].

Respondents filed a Reply to Application and Answer to Petition ("Opposition"). [Dkt. 11]. The Opposition does not dispute the facts set forth in the Application or Petition, nor does it provide any legal argument or authority in response to Petitioner's claims. *See* Opposition. Instead, Respondents contend that "Petitioner appears to be entitled to request and receive an initial bond hearing[.]" *Id.* at 2. Respondents filed Petitioner's I-213 Form with the Opposition. The I-213 states that, on "August 8, 2026, Pacific Enforcement Response Center (PERC) provided the lead for" Petitioner and that on August 9, 2026, ICE conducted a "targeted operation at Los Angeles International Airport" and "approached Alaska Airlines terminal…and observed a subject matching the targeted alien by the name of ABRAHAMYAN, Monika… exiting the terminal." I-213 at 2 [Dkt. 11-1]. The I-213 further states that Officers "informed ABRAHAMYAN that there was an arrest warrant for her apprehension and transported her to the Los Angeles Field Office…ABRAHAMYAN will remain in…custody pending removal proceedings." *Id.* at 3. Respondents have not produced an arrest warrant for Petitioner's August 9, 2026 arrest.

The Court held a hearing on September 10, 2026. Hearing Minutes [Dkt. 13]. Petitioner was present at the hearing, along with her counsel, and an Armenian interpreter. *Id.* The Court granted the preliminary injunction and ordered Petitioner's immediate release. *Id.*

At the hearing, counsel for Respondents was unable to produce an arrest warrant and asked

the Court to wait for an hour and keep Petitioner in custody so he could "go find" a warrant. *Id.* At the hearing and in the I-213, Respondents conceded that Petitioner had no criminal history. *Id.*

## III. LEGAL STANDARD

The standard for issuing a preliminary injunction is the same as that for issuing a temporary restraining order. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *see also Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). To prevail on such a motion, the movant must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm absent the temporary restraining order, (3) the balance of equities tips in his favor, and (4) a temporary restraining order is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). Where the non-movant is a government entity, "the third and fourth factors ... merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale such that "a stronger showing of one element may offset a weaker showing of another." *Id.* at 684 (citation omitted). "When the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Id.* (citation omitted).

## IV. DISCUSSION

### A. Relevant Immigration Law

Any noncitizen "who is physically present in the United States… may apply for asylum" irrespective of her immigration status. 8 U.S.C.A. § 1158(a)(1). A noncitizen must file for asylum within one year of her arrival in the United States. § 1158(a)(2). The "U.S. Government may grant asylum to a noncitizen if it determines that he is a refugee." *Urias-Orellana v. Bondi*, 607 U.S. 537, 540-541 (2026) (citing 8 U.S.C. §1158(b)(1)(A))(citations omitted).

Under the INA, a refugee is someone who "is unable or unwilling to return to his country of nationality because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (citing §1101(a)(42)(A))(citations omitted). "An asylum seeker can submit an affirmative application" to

be adjudicated by USCIS, "or raise asylum eligibility as a defense to removal proceedings" before an immigration judge. *Id.* (citing §§1158(a), 1229a(c)(4)). A "grant of asylum permits a [noncitizen] to remain in the United States and to apply for permanent residency after one year." *Ins v. Aguirre-Aguirre*, 526 U.S. 415, 419-420 (1999); 8 U.S.C.A. § 1159; 8 C.F.R. § 209.2.

The INA mandates that absent "exceptional circumstances", the initial interview on the asylum application shall commence within 45 days of the application's filing and the "final administrative adjudication of the asylum application…shall be completed within 180 days after the date an application is filed[.]" 8 U.S.C.A. § 1158(5)(A). However, many asylum applications are not adjudicated for years. *See Velasquez Cortes v. U.S. Citizenship & Immigr. Servs. (USCIS)*, 2026 WL 2020998, at *3 (N.D. Cal. July 13, 2026)(collecting cases where asylum applicants were waiting for their application to be adjudicated for between four and ten years). "Although USCIS may reject applications that are improperly filed, federal law entitles applicants to an individualized adjudication of their application once it is accepted for filing." *Venezuelan Ass'n of Massachusetts v. United States Citizenship & Immigr. Servs.*, 2026 WL 2255272, at *2 (D. Mass. Aug. 5, 2026) (citing 8 C.F.R. § 208.9(a)).

Generally, asylum applicants have been permitted to remain in the United States pending adjudication of their applications.[1] *See e.g.*, Pichkurova v. Los Angeles Asylum Off., WL 3763370, at *2 (C.D. Cal. Dec. 23, 2025) ; *see also Coyoy v. United States*, 526 F. Supp. 3d 30, 41 (D.N.J. 2021) ("The government does not seem to dispute that while her application for asylum is pending, [Plaintiff] is lawfully permitted to remain in the United States indefinitely."). They also may apply for employment authorization and seek permission to travel into and out of the United States. 8 C.F.R. §§ 208.7, 223.2.

---

[1] The government regularly asserts that asylum applicants may legally remain in the United States legally in its oppositions to immigrants' Administrative Procedure Act ("APA") claims in this district. *See Baizakova v. Jaddou*, 2024 WL 3063227, at *1 (C.D. Cal. June 14, 2024) ("While an asylum application is pending, a non-citizen may legally remain in the United States[.]"); L*iu v. Jaddou*, No. 2:24-CV-08212-JAK (SKX), 2025 WL 1911771, at *2 (C.D. Cal. Apr. 21, 2025); *Dumlu v. Edlow*, No. 8:25-CV-00056-KES, 2025 WL 3190886, at *9 (C.D. Cal. Oct. 2, 2025)("Defendants assert that '[w]hile an asylum application is pending, a noncitizen may legally remain in the United States'").

Asylum applicants are deemed "lawfully present" in the United States for purposes of applying for certain benefits while their applications are pending. *Id.* (citing 8 C.F.R. § 1.3(a)(5)). The period a noncitizen spends in the United States awaiting adjudication of her bona fide application for asylum does not count as "unlawful presence" for the purpose of determining inadmissibility under the INA. 8 U.S.C. § 1182 (a)(9)(B)(iii)(II).

"As a general rule, it is not a crime for a removable [noncitizen] to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). "When a [noncitizen] is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.'" *Id.* (citing 8 U.S.C. § 1229(a)). A Notice to Appear does not authorize an arrest. *Id.* It states information required by the INA, including the time and date of the noncitizen's removal hearing and other statutorily required information about the proceeding. *Id.*

The INA sets forth the appropriate conditions and prerequisites for the arrest of a noncitizen during removal proceedings. *Id.* "At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest, which may only be issued and served by certain immigration officers listed in the applicable regulations." 8 C.F.R. § 1236.1.

Without a warrant, ICE officers have limited authority to make arrests. *See* 8 U.S.C. § 1357. An ICE agent can only arrest a noncitizen without a warrant if both conditions clearly laid out in the statute are met at the time of the arrest—the officer has reason to believe that (1) the noncitizen is in the United States in violation of immigration law ***and*** (2) "likely to escape before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357 (a)(2); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995)( "Section 1357(a)(2) requires that the arresting officer reasonably believe that the [noncitizen] is in the country illegally and that she 'is likely to escape before a warrant can be obtained for [her] arrest.'"); *Vasquez Perdomo v. Mullin*, 2026 WL 2751388, at *19 (C.D. Cal. Sept. 2, 2026) (citing 8 U.S.C. § 1357 and explaining there are "two prerequisites for a warrantless arrest: The agent must have probable cause that (1) the detainee is in the United States in violation of any law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens, and (2) the detainee 'is likely to escape before a warrant can be obtained for his arrest.'"). "Put another

way, a warrantless arrest requires an individualized assessment of the person's flight risk." *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025).

"Removal is a civil, not criminal, matter." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Civil immigration detention is lawful only when it is carefully limited to the regulatory purposes of "ensuring the appearance of [noncitizens] at future immigration proceedings" and "preventing danger to the community." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Detention cannot be used to punish noncitizens, even those who have a final order of removal. *See id.* at 694 (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (disallowing hard labor punishment of immigrants)).

**B. Likelihood of Success**

**1. Due Process Claim[2]**

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. These protections extend to noncitizens present in the United States, including during removal proceedings and detention. *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also*, *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1162 (9th Cir. 2005), *as amended* (Mar. 10, 2005) ("Immigration proceedings, although not subject to the full range of constitutional protections, must conform to the Fifth Amendment's requirement of due process."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (noncitizens who have once "passed through our gates, even illegally" are entitled to due process of law).

"A due process violation occurs when detention becomes punitive rather than regulatory, meaning there is no regulatory purpose that can rationally be assigned to the detention or the detention appears excessive in relation to its regulatory purpose." *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021) (citing *Salerno*, 481 U.S. at 747). "In the context of immigration detention,

---

[2] The Petition asserts claims for (1) substantive due process and (2) procedural due process. For the purpose of evaluating whether a preliminary injunction should issue, the Court only addresses the procedural due process claim.

it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

In *Mathews v. Eldridge*, the Supreme Court outlined three factors relevant for the due process inquiry: (i) the private interest, (ii) the risk of an erroneous deprivation and the value of additional procedures sought, and (iii) the government's interest, including the burdens associated with the additional procedures sought. 424 U.S. 319, 335 (1976).[3] As explained below, and articulated by the Court at the hearing on September 10, 2026, each of the *Mathews* factors strongly favors Petitioner's release and her entitlement to a hearing before she may be re-detained.

**i. Private Interest**

The first factor under *Mathews* considers the nature of the private interest at stake. *Mathews*, 424 U.S. at 335. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." *Zadvydas*, 533 U.S. at 690. Generally, the Due Process Clause "requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Even individuals who face significant constraints on their liberty or over whose liberty the government wields significant discretion retain a protected interest in their liberty. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("The fact that a decision-making process involves discretion does not prevent an individual from having a protectable liberty interest."); *Hurd v. D.C., Gov't*, 864 F.3d 671, 683 (D.C. Cir. 2017) (holding that re-detention after pre-parole conditional supervision requires a pre-deprivation hearing); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole

---

[3] The Supreme Court, the Ninth Circuit, and its sister circuits have consistently applied the *Mathews* test to noncitizens' due process challenges where the noncitizen has entered and been residing in the United States. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (collecting cases).

context).

Petitioner's weighty private interest in freedom from arbitrary detention is further strengthened by the government's consistent conduct over the past decade—*viz.*, allowing Petitioner to reside freely and thereby creating a reasonable expectation that her freedom would continue absent some change in circumstances. Petitioner was admitted as a minor on a visa, and her mother filed for asylum (with Petitioner as a derivative on that application) before her visa expired.[4] Petition ¶ 17, Ex. 4, Asylum Application Receipt [Dkt. 1-4]. The Asylum Application Receipt from US Department of Homeland Security US Citizenship & Immigration Services states "Your complete Form I-589 asylum application was received and is pending as of 5/16/17. ***You may remain in the U.S.*** until your asylum application is decided." *Id.* (emphasis added). Respondents explicitly and implicitly promised Petitioner that she could reside freely in the United States until the Application was decided (and more specifically denied). *See Morrissey*, 408 U.S. 479 ("Implicit…is the notion that the [individual] is entitled to retain his liberty as long as he substantially abides by the conditions").

At the time of Petitioner's visa overstay (or at any time thereafter), Respondents were legally permitted and logistically able to initiate removal proceedings. Respondents knew about Petitioner's visa overstay and chose not to act—and not to ***detain*** Petitioner—during that time. Instead, Respondents accepted payment of the yearly fee on the Application. Respondents received Petitioner's I-765 application (including her mailing address, physical address, immigration status, and attestation regarding no criminal history) and granted Petitioner employment authorization valid

---

[4] The Court notes that Petitioner was under the age of 21 when her mother filed the asylum application. Pursuant to the Child Status Protection Act, Petitioner's age is "frozen" from the date her parent filed the Form I-589 and Petitioner does not age out the derivative asylum application. *See* 8 U.S.C.A. § 1158 (b)(3)(B) ("An unmarried alien who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and section 1159(b)(3) of this title, if the alien attained 21 years of age after such application was filed but while it was pending.").

through 2030.[5] Obviously, Petitioner would not need employment authorization if she were in custody. For nine years, Respondents knew Petitioner's legal status and her whereabouts and chose not to detain her. That creates a reasonable expectation that they would not detain her until there was a material change in circumstances—or at least until her asylum application was denied.

Of course, Petitioner's own conduct, such as committing a dangerous crime, could negate her reasonable expectation of freedom from detention. Subject to certain legal conditions, and following procedural requirements, the Attorney General certainly has discretion to detain noncitizens for the purpose of ensuring attendance at immigration proceedings and the safety of the community. *See* 8 U.S.C. 1226(a); 8 C.F.R. 1003.19 (bond hearings). But that does not provide unfettered discretion to arbitrarily detain, without a warrant and without a hearing, an immigrant who poses no risk of flight and no risk to public safety.

In evaluating the nature of Petitioner's liberty interest, the Court notes that affirmative asylum applicants, like Petitioner, generally wait years for their asylum application to be adjudicated by USCIS. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 836 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("While adjudication times for asylum applications vary, they are consistently long; applicants wait years to learn whether they have received asylum."); *Sudomir v. McMahon*, 767 F.2d 1456, 1461 (9th Cir. 1985) (Canby, J., dissenting) ("The government form…application…advises them: 'You may remain in the United States until a final decision is made on your case (or you are notified otherwise by [the Immigration and Naturalization] Service).'…Then they wait—currently from three to six years—for their asylum applications to be processed."). In addition, it has often been Respondents' past practice to not detain affirmative asylum applicants. *See e.g., Doe v. Jamison*, No. CV 26-1906, 2026 WL 916568, at *7 (E.D. Pa. Mar. 31, 2026) (The Court notes that the arrest and detention of affirmative applicants for asylum, who are patiently waiting for years-long delays in asylum adjudications…is an abrupt policy change. Several presidential administrations, including the first Trump administration, did not arrest and detain affirmative

---

[5] U.S. Citizenship and Immigration Services, Forms, I-765, Application for Employment Authorization, https://www.uscis.gov/sites/default/files/document/forms/i-765.pdf (last accessed October 2026).

asylum applicants who applied with lawful status.")

Here, Petitioner and her family have waited nearly ten years without even having their USCIS application interview scheduled. This length of time increases Petitioner's reliance on the government's explicit and implicit promise that affirmative asylees may remain in the United States, at liberty, absent a justifiable reason for their detention. It is simply unlawful for the government to allow such excessive delays in the adjudication of affirmative asylum applications and at the same time detain applicants for no obvious necessity—all without providing any due process.

Importantly, in the nearly ten years Petitioner has been in the United States, she built a life. She has legally worked for years, started her own business, and cared for her U.S. citizen sibling. Petitioner, like any free individual, has undoubtedly enjoyed innumerable moments of meaning and connection that cannot be captured in a court record. The Court cannot help but conclude that Petitioner has a substantial liberty interest in that life.[6]

---

[6] Similarly, many courts in the Ninth Circuit and throughout the country have found that asylum applicants, like Petitioner, who have resided freely for years in the United States awaiting the adjudication of their asylum applications have a significant Fifth Amendment interest in their continued liberty. *See Tzoc v. LaRose*, 2026 WL 2227161 (S.D. Cal. Aug. 3, 2026) (holding that petitioner who lived openly in the U.S. since 2010, filed an asylum application in 2024, and receive employment authorization valid through 2029, had a substantial liberty interest confirmed by the "Government's sustained course of conduct"); *Xianming H. v. Warden of the California City Detention Facility*, 2026 WL 1283415 (E.D. Cal. May 11, 2026) (holding that petitioner had a "clear liberty interest" where he had entered the U.S. on a tourist visa in August 2014, filed an affirmative asylum application in 2015, overstayed his visa, and resided in the U.S. for over a decade); *Grigoryan v. Lyons*, 2026 WL 2032230 (C.D. Cal. June 16, 2026) (finding that petitioner, who had been in the U.S. for six years, had "a liberty interest in his release, given that he entered the United States on a valid nonimmigrant visa, has a pending asylum application, and has significant family ties here"); *Tang v. Mullin*, 2026 WL 2666872 (C.D. Cal. Sept. 10, 2026) (reasoning that the "government's knowing decision not to detain an individual creates a liberty interest in their continued release" and granting release where petitioner with pending asylum application "developed a significant liberty interest in remaining free from detention to live her life" in the U.S.); *Ke v. Janecka*, 2026 WL 2508150 (C.D. Cal. Aug. 25, 2026) (finding that where petitioner lawfully entered the U.S. on a visa in 2022, filed an asylum application, obtained employment authorization and a Social Security number, lived openly with no criminal history, and "[c]onsidering the arc of the government's sustained conduct" petitioner had developed a substantial liberty interest in continued release"); *Juan R.R. v. Warden of the Golden State Annex*, 2026 WL 2137745 (E.D. Cal. July 24, 2026) (holding that petitioner who entered U.S. in 2018 on a visa, applied for asylum, and had a U.S. citizen child had a "clear liberty interest… and he has built a life here with a family").

In summary, Petitioner's interest bears all the hallmarks of a protected liberty interest—an interest in freedom from imprisonment,[7] a reasonable expectation in continued liberty absent certain changes in circumstance,[8] time further developing that interest,[9] and ties to the community.[10]

**ii. Risk of Erroneous Deprivation**

The second *Mathews* factor is the risk of erroneous deprivation of the protected interest. *Mathews*, 424 U.S. at 335. The Government's actions have already shown that the risk of erroneous

---

For example, Judge Curiel of the Southern District of California found that a petitioner, a Syrian national who entered the country with a valid tourist visa in 2016, and submitted an affirmative asylum application to USCIS before the expiration of his tourist visa, had "developed an interest in remaining" free during his ten-year residence waiting the adjudication of his asylum application. *Al Saadi v. LaRose*, 832 F. Supp. 3d 1115, 1119 (S.D. Cal. 2026). Judge Curiel reasoned that the "Petitioner is not an 'arriving' noncitizen but one that has present in our country for around ten years. This substantial amount of time indicates he is afforded the Fifth Amendment's guaranteed due process before removal." *Id.* at 1122. The court noted that Al Saadi "remained non-detained after filing his asylum application…timely applied for asylum and obtained a work authorization, a social security number…The[se] proceedings have created a protectable expectation of his due process rights in his removal proceedings and the fair procedures this country guarantees." *Id.* at 1123.

[7] *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

[8] *See Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S. Ct. 2593, 2601, 33 L. Ed. 2d 484 (1972) ("The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.").

[9] *See id.* ("He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation.") *See also*, *Duran A.H. v. Warden of the Cent. Valley Annex Det. Facility*, 2026 U.S. Dist. LEXIS 209805, *5 (2026) ("The time Petitioner spent at liberty underscores the gravity of its loss.").

[10] *See Morrissey*, 408 U.S. at 482 ("Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life."); *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982)(" '(a)n order requiring service of defendant's sentence now would needlessly jeopardize his long-term adjustment to society, disrupt both his family and his family life, and destroy his economic base, all for no purpose other than to secure blind obedience to the 1973 sentence as it was then imposed.' Here, too, reincarceration would involve disruption of Johnson's family and family life, the lives of his employees, and the affairs of his business creditors[.]")

deprivation for Petitioner is high. The ICE agents arrested Petitioner without a warrant or an assessment of her flight risk in violation of statute and regulations. *See infra* Part IV, Section B(2). Petitioner is not a flight risk. She resides at a permanent address with her family, has employment authorization, owns her own business, and has a pending asylum application. Nor is Petitioner a danger to the community. She has no criminal history and is a yoga instructor who helps her disabled younger brother. It is wholly unclear why Petitioner was arrested except for the unremarkable fact that she took a domestic flight and was presumably flagged by TSA; Respondents did not explain any reason to Petitioner, nor present any reason in their brief. Nevertheless, Petitioner was detained for a month. Had Respondents conducted a pre-deprivation hearing, before a neutral adjudicator, the unjustified detention of Petitioner could have been avoided.

**iii. Government Interest**

As to the third *Mathews* factor, there is no countervailing government interest that supports relying exclusively on a post-detention hearing. There appears to be no legitimate purpose for Respondents' sudden change of course in arresting Petitioner after nine years where she presents no indicia of danger or flight risk. *See Hernandez v. Sessions*, 872 F.3d at 994 ("[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."). "[W]hether or not the government's existing regulations and practices provide for pre-detention bond hearings, due process requires the government to identify some interest beyond its own administrative practices to justify depriving an individual of [his] liberty without any pre-deprivation protections. Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest." *Pinchiv. Noem*, 792 F. Supp. 3d 1025, 1036 (N.D. Cal. 2025).

Furthermore, there was no urgency in arresting Petitioner. Respondents knew her whereabouts and immigration status for years. They could have served a Notice to Appear at any time without arresting her. "[A]bsent evidence of urgent concerns, a pre-deprivation hearing is required to satisfy due process." *Id.* (collecting cases). *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d

1021, 1036 (N.D. Cal. 2025).

The Court concludes Petitioner is likely to succeed on the merits of her due process claim.

**2. Warrantless Arrest**

As a separate ground for release, Petitioner asserts a claim for unlawful detention incident to an illegal, warrantless arrest. Petition at 14–16. "An ICE officer may arrest someone if the officer obtains in advance a warrant for their arrest." *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1158 (D. Or. 2026); *see* 8 U.S.C. § 1226(a). Warrantless arrests by ICE officers are governed by 8 U.S.C. § 1357 ("Section 1357").

Petitioner claims that she was not presented with a warrant at the time of her arrest. Petition ¶ 20. Respondents have not rebutted this claim. *See* Answer to Petition [Dkt. 11].

And because ICE arrested Petitioner without a warrant, Section 1357 applies. Section 1357 authorizes an ICE agent to make a warrantless arrest only if he "has reason to believe" meaning probable cause,[11] that both (1) the noncitizen "is in the United States in violation of any such law or regulation" ***and*** (2) "is likely to escape before a warrant can be obtained for [the noncitizen's] arrest[.]" 8 U.S.C. § 1357 (a)(2). ICE's regulations reiterate this requirement:

> (i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.
> (ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

8 C.F.R. § 287.8 (c)(2).

"Courts have found that the 'likely to escape' question looks to 'the totality of the circumstances known to the officer before making the arrest,' including whether the officer can determine the individual's identity, previous escape attempts, and community ties such as family, a home, or a job." *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d at 1158. The determination that a noncitizen is likely to escape requires an individualized inquiry. *See Vasquez Perdomo v. Mullin*,

---

[11] "The phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause." *Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980).

2026 WL 2751388, at *20 (C.D. Cal. Sept. 2, 2026) ("probable cause requirement in Section 1357 and its corresponding regulation requires an individualized determination") (citing *Ybarra v. Illinois*, 444 U.S. 85, 91(1979)). Unlawful immigration status alone is insufficient to make a finding that the noncitizen is likely to escape. *See Makuiza v. Wesling*, 826 F. Supp. 3d 176, 182 (D. Me. 2026) ("Congress did not state in the INA that an alien may be arrested and detained pending removal based exclusively on alienage or noncitizen status."); *Vasquez Perdomo*, 2026 WL 2751388, at *20 ("To permit an officer to make the required likelihood of escape determination simply by determining that an individual is unlawfully present in the United States would render the language regarding the likelihood of escape determination superfluous."); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) ("Nor can it be the case that, simply by being potentially removable, an alien must be deemed to be likely to evade detention by ICE. Such a reading would render the limitations on warrantless arrest created by 8 U.S.C. §§ 1226(a) and 1357(a)(2) meaningless.").

There is no evidence that the ICE agents who arrested Petitioner without a warrant conducted the requisite "likely to escape" analysis. The I-213 filed by Respondents includes a narrative of the "encounter/arrest" but no mention of any likely-to-escape factors or analysis. I-123 [Dkt.11-1]. Instead, the I-213 states that ICE received a "lead for" Petitioner on August 8, 2026, before it "conducted a targeted operation" at LAX on August 9, 2026.[12] I-213 at 2. The agents saw Petitioner "exiting the [Alaska Airlines] terminal" and approached her. *Id.* They identified themselves as ICE agents and Petitioner cooperated in the interview, sharing her immigration status and showing the agents her California driver's license to help them confirm her identity. *Id.* at 2–3, 5.

Moreover, the facts known by the officers at the time of the arrest weigh ***against*** a finding of probable cause. Before the encounter, ICE knew who Petitioner was and that she had been in the United States for nearly ten years. ICE encountered Petitioner at a ***domestic arrivals*** terminal,

---

[12] The fact that the operation was "targeted" and that ICE had Petitioner's information at least a day in advance belies the need for a warrantless arrest. An immigration arrest warrant is administrative and does not require ICE to go before a judge in order to obtain one. Instead, the administrative warrant (Form 200), requires the assessment and signature of an immigration authority with the authority to do so.

returning home from a ***domestic*** trip. Petitioner was not yet in removal proceedings and had been living openly in the United States without any restrictions or conditions from Respondents for a decade. Therefore, it cannot be reasonably inferred she was at the airport to flee. When she was approached by ICE agents, instead of fleeing, she cooperated and provided truthful information about herself. She showed the agents her California driver's license, the possession of which indicates that she is settled and intends to remain. These are not the signs of someone who is likely to escape—quite the opposite.

The Court therefore concludes Petitioner is likely to succeed on her claim that ICE violated Section 1357 and its own regulations when it arrested her without a warrant.[13] Courts find that release from custody is the proper remedy for a warrantless arrest made in excess of ICE's authority, as was done here. *See, e.g.*, *Alberto C.M. v. Noem*, 817 F. Supp. 3d 735, 739 (D. Minn. 2026) ("The proper remedy for this kind of violation is release from custody, not a bond hearing.").

**C. Irreparable Harm**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "[U]nlawful detention certainly constitutes 'extreme or very serious'" injury which "is not compensable in damages." *Hernandez v. Sessions*, 872 F.3d at 999; *see also Hernandez v. Mullin*, 2026 WL 846037, at *10 (C.D. Cal. Mar. 24, 2026) ("It is well established that unlawful detention constitutes irreparable harm."); *Abrego Garcia v. Noem*, 812 F. Supp. 3d 550, 553 (D. Md. 2025) ("It is beyond dispute that unlawful detention visits irreparable harm.").

Moreover, the Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "subpar medical…care in ICE detention facilities." *Hernandez v. Sessions*, 872 F.3d at 995. Petitioner has chronic health conditions including allergic

---

[13] In addition, there is no evidence in the record that Respondents complied with another regulation requiring a prompt custody determination following a warrantless arrest. *See* 8 C.F.R. § 287.3 ("a determination will be made within 48 hours of the arrest…whether the alien will be continued in custody or released on bond or recognizance").

rash and cervical muscle spasm, which cause her significant pain and restrict her mobility. During her detention these conditions flared up, and she was unable to receive care for them. This factor also weighs strongly in favor of granting Petitioner's Motion.

**D. Balance of Equities and Public Interest**

Here, the balance of equities and public interest "tips sharply" in favor of Petitioner. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes*, 82 F.4th at 695 (citation omitted); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the [government] . . . to violate the requirements of federal law." (citation omitted)); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

Of course, the government undoubtedly has a significant interest in the enforcement of immigration laws, but the public also has an interest in "upholding procedural protections against unlawful detention." *Pinchi*, 792 F. Supp. 3d at 1037 (citation omitted). Without these procedures, the government cannot guarantee the accuracy of the outcome. *See Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 144 (W.D.N.Y. 2025) ("[F]air process—not just the correct outcome—matters. After all, without due process, there is no way to tell whether the result is in fact correct.").

In addition, Respondents' widespread practice of conducting warrantless arrests without an flight risk assessment (in violation of Section 1357) does not serve the public interest. See *Vasquez Perdomo v. Mullin*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 2751388, at *20 (C.D. Cal. Sept. 2, 2026) (noncitizen plaintiffs showed likelihood of success in their claims that their arrests were in violation of section 1357); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1215 (D. Colo. 2025) (same); *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1158 (D. Or. 2026) (same); *Makuiza v. Wesling*, 826 F. Supp. 3d 176, 180 (D. Me. 2026) (same); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 735 (E.D. Cal. 2025) (same); *Castanon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 843 (N.D. Ill. 2025) (same). And any "pleas of administrative inconvenience…never 'justify departing from the statute's clear text.'" *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021).

## V. CONCLUSION

For the foregoing reasons, and for the reasons stated on the record at the hearing on September 10, 2026, the Court grants the preliminary injunction. The Court ordered Respondents to release Petitioner Monika Abrahamyan (A# 216-327-011) from custody at the hearing.

Further, Respondents are:

- Enjoined and restrained from re-detaining Petitioner without immediately providing her with a fulsome pre-deprivation bond hearing, with her counsel present, and noticed at least 72 hours in advance.[14]
- Ordered to meet and confer with Petitioner's counsel regarding whether the Petition may be granted and judgment entered for the same reasons as those articulated in this order.

---

[14] At any such hearing, consistent with Ninth Circuit precedent, the government will bear the burden of showing by clear and convincing evidence whether Petitioner poses a flight risk or danger to the public. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1200 (9th Cir. 2022); *Martinez v. Clark*, 124 F.4th 775, 785–86 (9th Cir. 2024) ("At the outset of its decision, the BIA properly noted that the government bore the burden to establish by clear and convincing evidence that [the detainee] is a danger to the community."); *id.* at 786 (reiterating that "due process requires . . . the government to prove dangerousness or risk of flight by clear and convincing evidence") (citing *Singh v. Holder*, 638 F.3d 1196, 1200, 1205 (9th Cir. 2011), *abrogated on other grounds as recognized by Rodriguez Diaz*, 53 F.4th at 1202); *Al-Sadeai v. U.S. Immigr. & Customs Enf't*, 540 F. Supp. 3d 983, 990–91 (S.D. Cal. 2021) (discussing Ninth Circuit precedent establishing the government's burden and finding the IJ's placement of the burden of proof on detainee violated the Due Process Clause); *Balwan v. Bondi*, 2026 WL 497098, at *9 (W.D. Wash. Feb. 23, 2026) (surveying circuit caselaw and concluding that the government should bear the burden); *Vazquez v. Mattos*, 2026 WL 658896, at *2 (D. Nev. Mar. 9, 2026) (requiring the government to bear the burden) (citing *Singh* and *Martinez*); *Lima v. Wofford*, 2025 WL 3535009, at *4 (E.D. Cal. Dec. 10, 2025) ("The statute is silent on the burden of proof required in a bond hearing under § 1226(a). However, the Ninth Circuit has squarely ruled that due process requires that the Government bear the burden at a § 1226(a) bond hearing of justifying detention by clear and convincing evidence.") (citing *Singh*, 638 F.3d at 1203-06); *Mendoza v. Noem, et al.*, 2026 WL 683180, at *8-*9 (E.D. Cal. Mar. 11, 2026) (analyzing Ninth Circuit cases to find that the holding in *Singh* placing the burden on the government should still be followed).

- Ordered to either file a proposed judgment or a statement of the issues that remain to be evaluated by Judge McCormick in further proceedings within 7 days of this Order.

Dated: November 23, 2026

Hernán D. Vera
United States District Judge